**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DONALD ALEXANDER,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 11 C 1007** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **CARAUSTAR INDUSTRIES, INC.,** | ) | |
| *et al,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

### Introduction

Defendant Caraustar Industries, Inc., is the parent company of defendant Caraustar Custom Packing Group, Inc., which, in turn, runs Chicago Carton, a paperboard products manufacturing facility on Chicago's west side. The plaintiffs are several employees of that facility who claim they were underpaid for the hours they worked.

In their complaint, they alleged that although they were required to arrive before their shifts started and stay after their shifts ended in order to put on required protective gear – what the parties call "donning and doffing" – and discuss certain things to ensure a smooth shift transition, they were not paid overtime for these activities. (*Complaint*, ¶¶ 13-18). They further alleged that although they were required to clock in a minimum of 10 minutes before their shifts were scheduled to start, they were not paid for this extra time. (*Complaint*, ¶¶ 22-23). If they clocked in even 1 minute after their shift was scheduled to begin, defendants docked them a full 15 minutes pay. (*Complaint*, ¶ 24). If an employee was not relieved on time and had to continue working at their station, they were not paid overtime until an hour elapsed. (*Complaint*, ¶ 25). The plaintiffs filed sworn declarations in support of their motion for conditional certification [Dkt. #22] which detailed their

additional, uncompensated work duties. We have summarized the allegations in the following Table:

| Plaintiff | Alexander (Def.Ex. 2) | Camacho (Def.Ex. 3) | S.Gonzalez (Def.Ex. 4) | V.Gonzalez (Def.Ex. 5) | Grenados (Def.Ex. 6) | Maldanado (Def.Ex. 7) | Ortega (Def.Ex. 8) | Torres (Def.Ex. 9) |
|---|---|---|---|---|---|---|---|---|
| Pre-Shift Donning | 15 minutes | 5-10 minutes | 10 minutes | 10 minutes | 7 minutes | 10 minutes | 5 minutes | 15 minutes |
| Pre-Shift Walking | | 5 minutes | 5 minutes | 5 minutes | 5 minutes | 5 minutes | 5 minutes | 5 minutes |
| Pre-Shift Change | 10 minutes | 5 minutes | 5 minutes | 5 minutes | 5 minutes | 5 minutes | 5 minutes | 10 minutes |
| Post-Shift Tasks | | | 15 minutes per week | 15 minutes per week | 15 minutes per week | | 15 minutes per week* | |
| Post-Shift Change | 5-20 minutes | 5 minutes | 5 minutes | 5 minutes | 5 minutes | 5 minutes | 5 minutes | 10 minutes |
| Post-Shift Walking | | 5 minutes | 5 minutes | 5 minutes | 5 minutes | 5 minutes | 5 minutes | 5 minutes |
| Post-Shift Doffing | 15 minutes | 5-10 minutes | 10 minutes | 10 minutes | 7 minutes | 10 minutes | 10 minutes | 15 minutes |
| Post-Shift Paperwork | 10-20 minutes | | | | | | | |
| Monday Safety Meeting | 10-30 minutes | 10 minutes | | | | | | 15 minutes |
| Weekly Meeting | | 30 minutes Wednesday | | | | | 15 minutes Thursday | 15 minutes |

Essentially, the plaintiffs complain that they were paid by the shift rather than by the hour, and that as a consequence they generally worked many more than forty hours a week, but were only paid for forty hours. They bring claims under the Fair Labor Standards Act ("FLSA") and the Illinois Minimum Wage Law ("IMWL"). Both sides have filed motions for summary judgment. The defendants seek judgment on the entire case, the plaintiffs on just a portion. The defendants argue that donning and doffing of eyeglasses, earplugs, and shoes and walking to work stations are not compensable as a matter of law. They also contend that they are entitled to an offset for any unpaid, compensable time because the plaintiffs were given a 30-minute paid lunch period every day.

Finally, the defendants submit that time records and the plaintiff's own testimony reveal, as a matter of law, that plaintiffs are not entitled to any overtime pay.

But the conspicuous feature of the defendants' presentation is the vigorously advanced contention that the plaintiffs have perjured themselves by making repeated, knowingly false statements under oath in pre-deposition, sworn declarations regarding their claims and that as a consequence of their perjury their claims should be dismissed as a sanction under the court's inherent authority to impose the drastic sanction of dismissal when a litigant engages in conduct that abuses the judicial process. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44–45 (1991). *See infra* at 17-18. The plaintiffs do not deny that the declarations were false, but insist that at all times they have acted in good faith and that they did not perjure themselves.[1]

The plaintiffs' motion for summary judgment addresses the sole issue of the offset for the paid lunch periods. They argue that because the defendants and they treat the 30-minute lunch period as "hours worked," it must be included in calculating the 40-hour a week requirement for overtime compensation.

## Local Rule 56.1

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. "For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, –, (7th Cir. 2012). The party opposing summary judgment must respond to the movant's statement of proposed material facts, and

---

[1] In the federal criminal context, perjury is defined as false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory. *Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008).

that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Sojka*, 686 F.3d at —; *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). Each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *F.T.C. v. Bay Area Business Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005).

The district court is entitled to expect strict compliance with the rule. *Shaffer v. American Medical Ass'n*, 662 F.3d 439, 442 (7th Cir. 2011); *Benuzzi v. Board of Educ. of City of Chicago*, 647 F.3d 652, 654 (7th Cir. 2011). Responses and facts that are not set out and appropriately supported in an opponent's Rule 56.1 response will not be considered, *see Shaffer*, 662 F.3d at 442 (court need not consider any fact not contained in the parties' Rule 56.1 statements); *Bay Area Business Council*, 423 F.3d at 633 (court properly disregarded affidavits not referenced in 56.1 submission), and the movant's version of the facts – if compliant with the rule – will be deemed admitted. Local Rule 56.1(b)(3)(C); *Rao v. BP Products North America, Inc.*, 589 F.3d 389, 393 (7th Cir. 2009); Montano, 535 F.3d at 569; *Cracco*, 559 F.3d at 632.

## Factual Background

At Chicago Carton, hourly manufacturing employees like the plaintiffs were typically scheduled to work one of three shifts: (a) first shift, from 6:00 a.m. to 2:00 p.m.; (b) second shift, from 2:00 p.m. to 10:00 p.m. or (c) third shift, from 10:00 p.m. to 6:00 a.m. These shifts generally operated continuously, beginning at 6:00 a.m. on Mondays and concluding at 6:00 a.m. on Saturday mornings, with shifts occasionally scheduled for Saturdays and/or Sundays. For purposes of

calculating overtime, the workweek began at 6:00 a.m. on Sunday morning and ended at 5:59 a.m. on Sunday morning. (*Defendants' Local Rule 56.1 Statement of Material Facts* (*Def.St.*"), ¶6; *Plaintiff's Response to Portions of Def.St.*("*Pl.Rsp.*"), ¶ 6). All of the plaintiffs, except Donald Alexander, worked on manufacturing machines located on the plant floor, where they typically would replace an employee on their machine from the previous shift, and would typically be replaced by another employee on their machines at the end of their shifts. (*Def.St.*, ¶ 7; *Pl.Rsp.*, ¶7). Mr. Alexander was a maintenance mechanic. (*Def.St.*, Ex. 2, ¶ 3).

Chicago Carton requires employees to wear four items of personal protective equipment ("PPE") prior to entering the plant floor: a hairnet, earplugs, goggles, and steel-toed shoes. While the hairnet is not technically "protective" gear, it is required because the facility manufactures products used by the food industry. Chicago Carton provides a locker room and lockers for those employees who choose to change clothes at the facility or to store their personal belongings during the work day. The locker room is located on the second level above the plant floor. Chicago Carton does not require employees to don or doff this PPE at the facility (or in the locker room), but permits them to do so at their homes, in their cars, or wherever else they so choose. (*Def.St.*, ¶¶ 8-11). Significantly, the named plaintiffs all swore in their declarations that all defendants' employees were required to change on site. (*Def.St.*, ¶ 23; Exs. 2-9, ¶ 15). All those plaintiffs who were later deposed had to change their stories to match reality. (*Def.St.*, ¶ 10; Ex. 10, at 66-67, 89-92, 188-93; Ex. 11, at 47, 50-51, 113; Ex. 12, at 97-100, 329-31).

As can be seen from the chart detailing the plaintiffs' sworn declarations, *supra*, at 2, the time plaintiffs had to spend performing uncompensated tasks, donning and doffing protective gear, was a major portion of their lawsuit. The plaintiffs averred that it daily took them between 24 to 40

minutes to put on and take off their safety glasses, hairnets, earplugs, and steel-toed boots and walk to and from their stations. *See* Table, *supra* at 2. For other employees, the ritual was not nearly so time-consuming, and their testimony accords with common experience. Marques Bienaime swore it took him no more than 30 seconds to put on and take off all of his protective gear and less than a minute to walk to and from the locker room to his machine. (*Def.St.*, ¶ 9; Ex. 14, ¶¶ 4, 8). Enrique Garcia spends about a minute putting on his boots in the locker room, then puts on the rest of his protective gear on the way to his machine. It takes him 30 seconds. He spends another 30 seconds taking it off after his shift as he walks to the locker room, where he takes off his boots. (*Def.St.*, ¶ 9; Ex. 15, ¶¶ 4-5, 8). Lee Globke puts on and takes off his boots at home; the rest of his gear he dons and doffs in about 30 seconds. (*Def.St.*, ¶ 9; Ex. 16, ¶¶ 3, 6). For Kina Martin, putting on all her gear including boots takes about one minute. (*Def.St.*, ¶ 9; Ex. 17, ¶ 3). Carmen Rivera puts on and takes off her boots at home. Donning the rest of her protective gear takes less than a minute; doffing it takes less than 30 seconds. (*Def.St.*, ¶ 9; Ex. 18, ¶¶ 4 , 8). Finally, Steven Shelley puts on and takes off his boots at home; donning and doffing the rest of his protective gear takes about 30 seconds. (*Def.St.*, ¶ 9; Ex. 19, ¶¶ 4, 8). The plaintiffs were either outliers who were severely challenged by the prospect of slipping on and off just four items of protective gear, or they were blatantly lying.

Plaintiffs do not challenge the accuracy of the other employees's testimony. Instead, they submit it is not relevant because they are not plaintiffs in this case. (*Pl.Rsp.*, ¶ 9). But it most certainly is relevant to the plausibility of the plaintiff's testimony. While judges cannot make credibility determinations in summary judgment cases, they are not required to accept as true testimony in pre-summary judgment declarations that the plaintiffs, themselves, have conceded is

untrue. Moreover, the motion to dismiss on the basis of perjury is not governed by strict summary judgment principles.

Common sense and human experience, *see infra* at 19, compel the conclusion that the plaintiffs' declarations – which they ultimately were forced to concede were untrue – were, in fact, knowingly false when they were made. This conclusion is buttressed by the fact that the other employees are able to don and doff in 2.5% to 4% of the time the plaintiffs initially swore it took them. If plaintiffs were to be believed, in every pay period they were spending as many as *six and a half hours* more than their coworkers putting on and taking off ear plugs, glasses, hairnets and boots. Relatively speaking, when we are talking about tasks that take a matter of seconds, that's not a slight difference that can be accounted for by an uncertain memory or an unintentional exaggeration.

As it happens, when some of the plaintiffs were finally deposed, it became clear that they had lied – "under penalty of perjury pursuant to 28 U.S.C. §1746" – in their declarations. We begin with Mr. Alexander. In his declaration, Mr. Alexander said he spent 30 minutes every day, putting on and taking off his ear plugs, goggles, hairnet, and boots. (*Def.St.*, ¶ 27; Ex. 2, ¶ 24). At his deposition, he pared that down by quite a bit. He testified that it actually only took him about 5 minutes to put on and take off his shoes and seconds for everything else; about one-third the time he had sworn to earlier. (*Def.St.*, ¶¶ 28-29; Ex. 10, at 71-72, 130-31). Mr. Alexander worked for defendants for 9 years, and his overtime rate was $33.00 per hour, (*Def.St.*, Ex. 2, ¶¶ 2, 4), but it would appear that his claim covers five years: 2006 through 2010. As such, he attempted to pad his claim to reap an additional $13,200 in damages.

When questioned about the discrepancy at his deposition, Mr. Alexander replied, "I don't

know what to say about that, man. You know?" (*Def.St.*, ¶ 29; Ex. 10, at 305-06). In their Local Rule 56.1 response, the plaintiffs simply say, "Disputed," and point back to Mr. Alexander's pre-deposition declaration. (*Pl.Rsp.*, ¶ 29). If plaintiffs are attempting to say that, because Mr. Alexander changed his story at his deposition, there is a disputed issue of material fact as to how long he spent donning and doffing, that contention is untenable. It has it has been well-settled for years that plaintiffs cannot create issues of fact by contradicting themselves with post-deposition affidavits. *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012); *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir.1996). Here, the contradictions are with pre-deposition affidavits – which have now been admitted to be false – and that is manifestly not a basis for creating an issue of fact. And finally, apart from all this, even in summary judgment cases, summary judgment is not to be defeated merely because a party makes some factual claim. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue' for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

Mr. Alexander also tried to pad his compensable time beyond his donning and doffing claim by asserting in his pre-deposition declaration that every day, beginning in January 2010, he was required to fill out paperwork for 10 to 20 minutes and was owed overtime pay for that as well. (*Def.St.*, ¶ 26; Ex. 2, ¶¶ 23-24). At his deposition, however, he admitted that he didn't have to do this. (*Def.St.*, ¶ 26; Ex. 10, at 146-47). The "[p]aperwork [was] for the other guys to finish up. . . . [he] didn't have to do no paperwork . . . ." (*Def.St.*, ¶ 26; Ex. 10, at 300). Mr. Alexander said his statement in his declaration wasn't true, and tried to explain the falsity – stunningly – by saying

that the *entire paragraph was "a typo."* (*Def.St.*, ¶ 26; Ex. 10, at 301; *Pl.Rsp.*, ¶ 26). The trumped up claims from Mr. Alexander do tend to add up. Donning, doffing, and paperwork come to about 50 minutes of overtime  – $27.50 – per day. That's around $6600 for every year at issue.

There are other problems with Mr. Alexander's pre-deposition declaration. In it, he swore that when he worked for defendants, he was a maintenance mechanic whose "Primary Job duty . . . was to repair and troubleshoot the equipment and to do building and ground maintenance throughout the plant." (*Def.St.*, ¶ 25; Ex. 2, ¶¶ 2, 9). At his deposition, he admitted that those were not his duties during the relevant period and had not been since prior to 2006. (*Def.St.*, ¶ 25; Ex. 10, at 301; *Pl.Rsp.*, ¶ 25). Plaintiff argues that his duties are immaterial because he is entitled to pay for hours worked regardless of his duties. (*Pl.Rsp.*, ¶ 25). But that's beside the point. The point is that in paragraph after paragraph of his declaration, Mr. Alexander did not tell the truth.

Finally, in his declaration, Mr. Alexander swore that defendants only paid him for eight hours per shift, even though he always worked more hours than that. (*Def.St.*, ¶ 33; Ex. 2, ¶¶ 25, 28). At his deposition, he had to concede that this was not true. (*Def.St.*, ¶ 33; Ex. 10, at 255, 317-18). Mr. Alexander also asserted in his declaration that he had personal knowledge that defendants failed to make and keep records of all hours employees worked. (*Def.St.*, ¶ 34; Ex. 2, ¶¶ 35, 39). When challenged at his deposition, he conceded that he had no basis for that assertion. (*Def.St.*, ¶ 34; Ex. 10, ¶¶ 2, 9).

Ms. Maldonado said in her declaration that she spent 20 minutes every day putting on and taking off her protective gear and an additional 5 minutes walking to and from her work station. (*Def.St.*, Ex. 7, ¶¶ 22, 29). At her deposition, she had to admit that it took her only three minutes to put her protective gear on (*Def.St.*, ¶ 37; Ex. 11, at 54-55), and a matter of seconds – just a few

for each one of the four items – to take her equipment off at the end of her shift.  (*Def.St.*, ¶ 37; Ex.

11, at 105-06).  Her clock-in and clock-out records also belie her declaration in which she swore that

the first thing she did when she arrived at work was clock in, and the last thing she did before

leaving work was clock out.  (Ex. 7, ¶¶ 24-25).  Yet, her clock-in and clock-out records show that

of the 328 times she swiped out from February 2008 through the end of her employment, *only three*

occurred 15 minutes or more past the scheduled end of her shift.  (*Def.St.*, ¶ 37; Ex. 11, at 105-06).

 If she really spent 15 minutes before and after *every* shift donning, doffing, and walking, and

additional time with her shift change responsibilities – as she asserted in her declaration – surely

there would be more than just three occasions to support her claims.

Ms. Maldonado was also dishonest about her break time, not to mention the break time of

all her co-employees.  She said that neither she nor any other Caraustar employee ever got any

breaks longer than 15 minutes during the workday.  (*Def.St.*, ¶ 38; Ex. 7, ¶12).  At her deposition,

however, she conceded that every day, she got a full 30-minute break away from her machine for

lunch. (*Def.St.*, ¶ 38; Ex. 11, at 86-87).

So, Ms. Maldanado padded her donning and doffing by about 16 minutes every day.  Her

declaration suggests her suit covers more than three years, from May 2006 to October 2009.[2]

(*Def.St.*, Ex. 7, ¶ 2).  Given that her overtime rate was $21.00 per hour and assuming she worked 48

weeks a year, her statements made under penalty of perjury would have been worth an additional

$4800 in damages.[3]  The plaintiffs' brief fecklessly asserts that she was not lying or acting in bad

---

[2] There is no indication, either in the plaintiffs' complaint or in their summary judgment material, of
for how long a time period they are seeking damages.

[3]  This calculation is based upon an assumption that the plaintiff was entitled to four weeks of
vacation. If Ms. Maldanado was only entitled to two weeks of vacation, her claim would have been padded
(continued...)

faith, but merely that she hadn't had adequate time to reflect on the matter when she signed her declaration. But the contents of the declaration obviously came from her, as her lawyers would have had no means of calculating the number of hours worked. Alternatively, there is the contention that she didn't mean what she said in her declaration. (*Pl.Rsp.*, ¶¶ 37, 38).

The problem with these excuses – apart from their obvious and inherent implausibility – is that they come, not from Ms. Maldanado, but her counsel. There is no affidavit from Ms. Maldanado providing any explanation whatsoever for the false statements she made in her declaration, however flimsy that explanation might have been. *Compare*, 535 F.3d at 565 (plaintiff provided innocent explanation for discrepancy). Her attorney's attempted explanation has no evidentiary effect in a Local Rule 56.1 submission or in any other context. *United States v. Adriatico-Fernandez*, – F.3d –, –, 2012 WL 6200276, *3 (7th Cir. 2012)("A lawyer's unsupported statements are not evidence."); *United States v. Chapman*, 694 F.3d 908, 914 (7th Cir.2012); *United States v. Diaz*, 533 F.3d 574, 578 (7th Cir.2008); *Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 853 (7th Cir. 2002); *United States v. Babul*, 476 F.3d.498 (7th Cir. 2007)(Easterbrook, C.J.)("lawyers' arguments – talk about what *might* be, rather than [evidence] about what *is*")(emphasis in original); *United States v. Stevens*, 500 F.3d 625, 628–29 (7th Cir.2007); *IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.,* 437 F.3d 606, 610–611 (7th Cir.2006). *Cf. In re: Payne,* 431 F.3d 1055, 1060 (7th Cir.2005)(unsubstantiated assertion at oral argument given no weight). Ms. Maldanado has offered no excuse for the rather large discrepancy – 400% – in her two stories. Her lawyer's assertions about the reason for the testimonial discrepancies are

---

[3](...continued)
by an amount greater than $4800.

unavailing.

The contention that the discrepancy between the facts admitted at the deposition and those falsely claimed in the declarations establishes a genuine issue of fact is startling. (*Pl.Rsp.*, ¶¶ 39-40). How the discrepancies between the admissions at the depositions and prior perjurious declarations can create a genuine issue of fact is not explained, and in any event, is utterly devoid of any merit. *Holloway*, 700 F.3d at 1075; *Buckner*, 75 F.3d at 292.

Mr. Torres also, to put it mildly, grossly inflated his donning and doffing time. In his pre-deposition declaration, he said he spent 30 minutes every day putting on and taking off his protective gear. (*Def.St.*, ¶ 63; Ex. 9, ¶ 23). Like the others, he was forced to abandon that assertion at his deposition. Instead, he initially said that donning only took 5 to 7 minutes. (*Def.St.*, ¶ 63; Ex. 12, at 90). Even that was at best an exaggeration. When asked to demonstrate how long it took to put on safety glasses, ear buds, and hairnet, Mr. Torres was apparently at peak performance, because he was able to do each in a matter of, not minutes, but seconds. (*Def.St.*, ¶ 63; Ex. 12, at 101-112). He had to admit that safety glasses took 10 seconds to put on, (Ex. 12, at 105), ear buds took 15 seconds (Ex. 12, at 108-09), and the hairnet took 10 seconds to don. (Ex. 12, at 112).

Mr. Torres's explanation for the large discrepancy between his declaration and his performance, and for his estimate at his deposition and what he actually did in the demonstration, was far more revealing than his lawyer now saying he had "reflected" on the matter or he "didn't know what to say about that, man." The following exchange occurred after Mr. Torres put on his safety glasses in a matter of seconds:

Q. And how long would you estimate that took you?

A. I'd say about a minute.

Q. Would you say that that took you more like two or three seconds?

A. No, I'd say about a minute.

Q. Okay. Should we just time it?

A. No. I mean, I don't know if you're a mathematics -- in mathematics like I am. There's point zero, and then there's one.

Q. No. I'm talking about how many --okay. Let's do it differently. How many seconds would you say –

A. All right. That's a whole different --

Q. -- that it took you to put on those glasses?

A. Twenty, 30 seconds –

Q. Okay. Why don't you try it again.

A. -- but that's more than -- that's not zero/zero. It's more towards one, so I'd say a minute.

Q. Okay. That's not what I'm asking you.

A. How many seconds?

Q. How many seconds --

A. I'd say 30 seconds.

(*Def.St.*, ¶ 63; Ex. 12, at 103-04). After a couple of more exchanges like this, Mr. Torres finally abandoned his "mathematics" theory of time and was compelled to come to grips with the passage of time on this planet:

Q. And from the moment you pick them up to the moment you have them on your face and your hands leave, count.

           *       *       *

A. (Continuing) – two, three, four, five, six, seven, eight, nine, ten (indicating). About ten.

(*Def.St.*, ¶ 63; Ex. 12, at 105).

Mr. Torres also swore in his pre-deposition declaration that he spent 15 uncompensated minutes each week in a production or safety meeting. (*Def.St.*, ¶ 67; Ex. 9, ¶ 26). At his deposition, he admitted that this was actually only 5 uncompensated minutes. The meetings took place during the first or last five minutes of a shift. The pre-shift meeting started 5 minutes before shift and ran just 19 minutes, the last 5 minutes being compensated shift time. The post shift meeting began 5 minutes before shift end and lasted just 10 minutes, not 15. (*Def.St.*, ¶ 67; Ex. 12, at 227, 231-37).

Also, since Mr. Torres swore in his declaration that he spent 30 minutes after *every* shift on unpaid work duties before clocking out, (*Def.St.*, ¶ 69; Ex. 9, ¶ 23), one would expect that the vast majority of his clock-out times would reflect this. Yet, of the 642 times Mr. Torres clocked out from February 2008 onward, just 18 were 20 minutes or more after the scheduled end of his shift. (*Def.St.*, ¶ 69; Ex. 13 & 13H). The vast majority were not 30 minutes after shift, they were 10 or fewer minutes after shift. (Ex. 13H).

These were apparently the only plaintiffs deposed, but as the plaintiffs were unanimous in their "exaggerations" – to use a euphemistic term – about how long they spent donning and doffing, the remaining plaintiffs were padding their claims as well. Like the plaintiffs who were deposed, the remaining plaintiffs' inflation of their claims is proven by their clock-in and clock-out records.

In her declaration, Sofia Gonzalez swore that she spent *at least* 20 and up to 35 minutes after each shift performing unpaid work – doffing, walking, shift change, and weekly meetings. (*Def.St.*, ¶ 50; Ex. 4, ¶ 23). If, as she asserts, the very last thing she does every day is clock out, then surely in the 931 times she clocked out between February 2008 and December 2011 there would be far more than just 19 times that she swiped out 20 minutes or more past the scheduled end of her shift.

(*Def.St.*, ¶ 51; Ex. 13 & 13C). The vast majority of those swipeouts occurred fewer than 10 minutes after her shift and, in the main, are in the 4-7 minute range. (Ex. 13C).[4]

Veronica Gonzalez swore that she spent 20 minutes post-shift *every day* performing unpaid work activities before clocking out. (*Def.St,*, ¶ 55; Ex. 5, ¶ 23). Yet, of her 953 swipeouts from February 2008 through December 2011, only four occurred more than 15 minutes after the scheduled end of her shift. (*Def.St,*, ¶ 56; Ex. 13 & 13D). In fact, a surprisingly large portion of those swipeouts occurred right at the end of her shift or a minute or two later. (Ex. 13C). Only 17 of Julieta Granados's 570 swipeouts from February 2008 onward support her assertion that she spends 17 minutes after *every shift* doing unpaid work. (*Def.St,*, ¶ 60-61; Ex. 6, ¶¶ 23, 26; Ex. 13 & 13E). In the main, her swipeouts were no more than four minutes post-shift. (Ex. 13E).

In his declaration, Mr. Ortega attested that he spent at least 20 minutes post-shift on unpaid work before clocking out; once a week, his figure was 35 minutes. (*Def.St.*, ¶ 75; Ex. 8, ¶¶ 23, 26). But, only 14 of his 653 swipeouts from February 2008 onward occurred more than 14 minutes after the scheduled end of his shift. (*Def.St.*, ¶ 75; Ex. 13 & 13G). He clocked out 30 minutes post shift, not on a weekly basis as he swore, but just 6 times in over three years. (*Def.St.*, ¶ 74; Ex. 13 & 13G). For the most part, he clocked out no more than 4 minutes after the end of his shift. (Ex. 13G).

_____

[4] This is a pattern throughout the plaintiffs' pre-deposition declarations. In their response to the defendants' statement of facts, they submit that they never averred that they did their donning and doffing, or other activities at issue, prior to clocking out. Yet, all the plaintiffs declared that "[w]hen [they] arrive[d] at work, [they] clock[ed] into a time clock system managed by Caraustar," that [w]hen [they] leave work, [they] clock out of the time clock system . . . .", and that [e]xcept in rare circumstances, each day [they are] scheduled to work [their] time in and time out is always greater than 8 hours . . . ." (Ex. 2, ¶¶ 26, 27, 29; Ex. 3, ¶¶ 27, 28, 30; Exs. 4-6, 8, ¶¶ 25, 26, 28; Ex. 7, ¶¶ 24, 25, 27; Ex. 9, ¶¶ 29, 29, 31). Nowhere in any of the declarations do plaintiffs say they performed the disputed activities prior to clocking in or after clocking out. As such, the objection is unsupported by the record and stands as an admission under Local Rule 56.1. *Matthews v. Donahoe*, – F.3d –, –. 2012 WL 4378272, 2 (7th Cir. 2012); *On-Site Screening, Inc. v. United States*, 687 F.3d 896, 897 (7th Cir. 2012).

Edgar Camacho swore that he spent 10-15 minutes after *every shift* performing unpaid work. (*Def.St.*, ¶ 82; Ex. 3, ¶ 25, 28).  From February 2008 through October 2010, approximately 590 work days, Mr. Camacho generally clocked out no more than 4 minutes after the scheduled end of his shift.  He clocked out 10 or more minutes late just approximately 35 times.  (*Def.St.*, Ex. B).

Mr. Camacho also said that *every Wednesday* he had to show up 30 minutes early for a meeting.  (*Def.St.*, ¶ 82; Ex.3, ¶¶ 10, 24).  If that's the case, he only made it to 10 of the 86 meetings. (*Def.St.*, ¶ 81; Ex. 13 & 13J).

Given the pervasiveness and willfulness of the falsity in the declarations  the defendants' request that the plaintiffs' claims be dismissed as a sanction for perjury is neither surprising nor unreasonable. In their response to defendants' motion, the plaintiffs say they want to withdraw their donning, doffing, and walking claims, conceding they are not compensable activities.  (*Plaintiffs' Response in Opposition*, at 1 n.2).  The Seventh Circuit decided as much in *Sandifer v. United States Steel*, 678 F.3d 590 (7th Cir. 2012), but plaintiffs argue that case is limited to unions with collective bargaining agreements.  (*Plaintiffs' Response in Opposition*, at 1 n.2).  If *Sandifer* is not behind plaintiffs' change of heart, that leaves the unearthing of their perjury.

In response to the defendants' charges, they argue that because they have abandoned their donning-doffing-walking claims, their statements are not material and, therefore, cannot be perjurious. *See* 18 U.S.C. §1621; *United States v. Grigsby*, 692 F.3d 778, 785 (7th Cir. 2012); *United States v. Johnson*, 612 F.3d 889, 893 (7th Cir. 2010).  *Significantly, this is the only response they muster to the defendants' request for dismissal as a sanction for their mendacity.* See *MindGames, Inc. v. Western Pub. Co., Inc*, 218 F.3d 652, 659 (7th Cir.  2000)("MindGames did not respond to the argument.... We find its silence eloquent and Western's argument compelling."); *Law v. Medco*

*Research Inc.*, 113 F.3d 781, 787 (7th Cir.1997); *Milam v. Dominick's Finer Foods, Inc.*, 567 F.3d 830, 832 (7th Cir.2009) (Easterbrook, C.J.)("My earlier opinion explained why secrecy appears to be unwarranted, and I take plaintiffs' silence in their response as acknowledgment."). Failure to respond to an opposing party's argument "is not necessarily a waiver, but it is a risky tactic, and sometimes fatal." *Law v. Medco Research Inc.*, 113 F.3d 781, 787 (7th Cir.1997). In this case, it is.

In any event, the argument is preposterous. The question in cases of claimed perjury is whether the false statements were material *when made*. *United States v. Abroms*, 947 F.2d 1241, 1246 (5th Cir. 1991). "A false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.' . . . The statement need not *actually* affect the decision." *United States v. Grigsby*, 692 F.3d 778, 785 (7th Cir. 2012). If it were otherwise – if it were the way the plaintiffs want it to be – litigants could lie about claims to the point of getting caught, then withdraw those claims with impunity. It would be well worth it to pursue a pattern of perjury because there would no risk, either civilly or criminally so long as the perjurer abandoned the claims intended to be supported by the perjurious testimony. Under the defendants' perverse view, the integrity of the judicial system can compromised with the wrongdoer suffering no effective sanction.[5]

The plaintiffs' argument puts out of view the seriousness of their conduct. "'[P]erjury strikes at the heart of the integrity of the judicial system....'" *United States v. Stokes*, 211 F.3d 1039, 1046 (7th Cir. 2000). It "undermines the function and province of the law and threatens the integrity of judgments." *United States v. Alvarez*, – U.S. –, –, 132 S.Ct. 2537, 2540 (2012). It "poisons the life

---

[5]Withdrawal of the perjurious claims without more does not in the slightest penalize the plaintiffs since the charges never should have been brought. And in cases like this, the defendant's ability to recoup its costs in unearthing the fraud would be illusory because the plaintiffs are not collectible.

blood of the administration of justice." *United States v. DiStefano*, 464 F.2d 845, 854 (2nd Cir.1972)(Friendly, C. J.). Because of its seriousness and pernicious consequences, perjury may warrant the drastic sanction of dismissal. *Jackson v. Murphy*, 468 Fed.Appx. 616, 619-620, 2012 WL 759363, 3 (7th Cir. 2012); *Montano*, 535 F.3d at 564; *Allen v. Chicago Transit Authority*, 317 F.3d 696, 703 (7th Cir. 2003) ("it is arguable that a litigant who defrauds the court should not be permitted to continue to press his case.").

Of course, the severity of any sanction must be proportioned to the gravity of the offense, and while a serious offense, perjury will not automatically result in dismissal if, in the particular setting of the case, it would be excessive. Since the "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant,'" *Sandra T.E. v. South Berwyn School Dist.*, 600 F.3d 612, 619 (7th Cir.2010)(quoting *Upjohn v. United States*, 449 U.S. 383 at 390-91 (1981), in cases such as the instant case there must be a careful assessment of the facts, as the court made clear in *Allen*:

> Suppose [,the court hypothesized,] the opposing litigant had perjured himself as well. Or suppose the perjury was clumsily committed and quickly discovered, as indeed happened here. If the perjury were harmless so far as affecting the course of the litigation was concerned, it might still be deserving of criminal punishment yet dismissal might be excessive from the perspective of a civil litigation.

*Allen*, 317 F.3d at 703.[6] Ultimately the choice of sanctions is a discretionary call by the district

---

[6] The single case relied on by *Allen* was *Shepherd v. American Broadcasting Companies, Inc.*, 62 F.3d 1469, 1480 (D.C. Cir. 1995). There, the Court of Appeals concluded that alternative sanctions, such as issue-related sanctions or fines, would have been effective to deal with the single destruction and alteration of a document and the harassment of witnesses and filing false affidavits. The Court of Appeals reversed most of the district court's factual findings about the claimed misconduct and noted that the alleged alteration did not go to the heart of plaintiffs' case. In the instant case, the plaintiffs' perjury is clear and went to the very heart of the case as did the perjury in *Negrete v. National R.R. Passenger Corp.*, 547 F.3d 721, 724 (7th Cir.2008)("But Negrete's misconduct related to the most important issues of the case-how badly he was

(continued...)

court, reviewable under the deferential abuse of discretion standard. *White v. Williams*, 423 Fed.Appx. 645, 646-647 (7th Cir. 2011). *Cf., Thomas v. General Motors Acceptance Corp.*, 288 F.3d 305, 308 (7th Cir. 2002).

Here, however, defendants have not perjured themselves, and the plaintiffs' carefully contrived, pervasive, perjurious statements were not quickly discovered; they stood for over a year, and discovery and depositions were required to ferret them out. That is not surprising since the mutually corroborating nature of the falsehoods made detection less likely, for, as Judge Friendly has observed, "the likelihood of perjury or mistake becomes more remote in direct, or even geometrical, proportion to the number of persons who testify to a fact." *N.L.R.B. v. Stark*, 525 F.2d 422, 427 (2nd Cir. 1975). In short, it was costly in terms of discovery, *Jackson*, 468 Fed.Appx. at 620 ("plaintiff created a factual dispute where there was none, costing the defendants time and resources."), and judicial resources. In fact, the plaintiffs' pattern of perjury likely played a role in Judge Lindberg's decision regarding class certification. (Dkt. # 41, at 3). In short, the perjury wasn't harmless.

Eventually, the defendants marshaled their evidence of perjury and made it a part of their motion for summary judgment. Their mendacity found out, the plaintiffs finally capitulated on their donning, doffing, walking claims. This, despite the fact that they contended the controlling case on those claims did not apply to them. What, then, could have been the strategy behind abandoning so great a portion of their suit and potential attendant damages? They weren't being offered anything in return. The circumstances suggest rather compellingly that plaintiffs hoped that their belated

---

[6](...continued)
injured and whether he was able to work.").

gesture would allow their fraud on the court to go unpunished. But, as noted earlier, falsifying claims and then simply withdrawing them without consequence and proceeding apace with the balance of a suit creates a farcical situation. Allowing it to happen without consequence sets a poor precedent – a court must be mindful of its responsibility "'to deter future parties from trampling upon the integrity of the court.'" *Jackson*, 468 Fed.Appx. at 620, 2012 WL 759363, 3 (quoting *Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003)).

Moreover, the plaintiffs have offered no excuse – certainly no plausible excuse – for the large discrepancies between their declarations and their depositions and clock-out records. "I don't know what to say about that, man" is not an explanation, but a concession that one's perjury has simply not been successful. Neither is the "mathematics" theory of time or entire paragraphs in the pre-summary judgment declarations being "typos." Reflection and imprecise memory might be acceptable excuses in situations where discrepancies were minor, but they were not minor here and none of the plaintiffs themselves offered such an excuse. In any event, common sense and human experience –which always have a role to play, *United States v. Montoya De Hernandez*, 473 U.S. 531, 542, (1985); *Greenstone v. Cambex Corp.*, 975 F.2d 22, 26 (1st Cir.1992) (Breyer, C.J.); *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir.2009); Posner, How Judges Think at 116 (Harv. Univ. Press 2008) – would require such an excuse, even if properly advanced, to be rejected. Indeed, judges are neither required nor free to ignore obvious and indisputable facts. *By Product Corp. v. Armen-Berry Co.*, 608 F.2d 956, 960 (7th Cir. 1982); *Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655, 668 (7th Cir. 1965). See also, *Griffis v. S.S. Kresge Co.*, 150 Cal.App.3d 491, 197 Cal. Rptr. 771, 777 (1984); *Bassey v. City of Huntington Woods*, 344 Mich. 701, 74 N.W.2d 897, 899 (1956) ("Courts are not required to close their eyes to facts obvious to the rest of

mankind.").

On the present record, none of the plaintiffs is suffering from an impairment that would have prevented him from remembering whether it took less than 1 minute to take off protective gear as opposed to the 15 minutes originally claimed under oath in the declarations. And really, memory should have little to do with giving an estimate for putting on and taking off ear plugs, glasses, hairnets, and boots. The estimates the plaintiffs gave were incredible on their face. It does not take 15 minutes to put in ear plugs, put on a hair net, and put on a pair of boots– either individually or collectively. This then is not a case involving mere "[d]iscrepancies arising from impeachment, inconsistent prior statements, or the existence of a motive," none of which "render witness testimony legally incredible." *United States v. McEntire*, 153 F.3d 424, 435 (7th Cir.1998). It is rather, a case in which the stories were so fantastic and contrived that there is no other explanation than perjury to account for them.

Similarly, memory and reflection could not account for saying something happened week in and week out when it did not. And saying something happened every single day over 500 or 600 days when it happened just 20 or fewer times is too great a variance to accord to faint memory. And the pertinent period the plaintiffs were addressing was not in the distant past; it was no more than a couple of years ago. And finally, this is not a story told off-handedly without reflection. Quite the contrary, it was a statement made to the plaintiffs' own lawyers – whom we may assume carefully discussed it with their clients – in anticipation of its memorialization in a sworn document made in support of the case. It is not, therefore, a case of "confusion, mistake, or faulty memory." *United States v. Grigsby*, 692 F.3d 778, 785 (7th Cir. 2012); *Montano*, 535 F.3d at 564. The lack of any plausible excuse by the plaintiffs, supported by admissible proof, and the unchallenged evidence

in the case demonstrate by clear and convincing evidence – which we assume the standard to be for purposes of our discussion, *cf., Watkins v. Nielsen*, 405 Fed.Appx. 42, 44-45 (7th Cir.2010); *Ridge Chrysler Jeep LLC v. DaimlerChrysler Financial Services Americas LLC*, 516 F.3d 623, 625 (7th Cir. 2008) – that the plaintiffs perjured themselves as perjury is defined in the federal system. *See* note 1, at 3.

There is another line of cases in the Seventh Circuit that bears upon the present inquiry insofar as it reflects the court's unwillingness to tolerate intentional assaults on the integrity of the judicial system through perjury. The Seventh Circuit has sustained dismissals of cases *with prejudice* where a plaintiff lies about his or her lack of funds in an accompanying *in forma pauperis* petition even though that lie does not bear upon the truthfulness of the allegations in the underlying lawsuit. *See Holly v. Wexford Health Services, Inc.*, 339 Fed.Appx. 633 (7th Cir. 2009); *McRoyal v. Commonwealth Edison Co.*, 263 Fed.Appx. 500, 502, 2008 WL 345345, 2 (7th Cir. 2008); *Thomas v. GMAC*, 288 F.3d 305, 308 (7th Cir.2002).[7] In the instant case, the perjury is not tangential to the merits of the case, but constitutes the case itself.

Despite the plaintiffs' pervasive perjury and lack of any plausible explanation by them through affidavits submitted in opposition to the motion, their lawyer's response brief conclusorily asserts that they did not act in bad faith and thus their case should not be dismissed. They liken their situation to that of the plaintiff in *Olivas v. A Little Havana Check Cash, Inc.*, 324 Fed.Appx. 839 (11th Cir. 2009)(*per curiam*), where the district court refused to exercise its discretionary power to strike the pleadings of a plaintiff "as a sanction for perjury and fabrication of evidence." *Id.* at 842.

---

[7] While the relevant statute requires dismissal, 28 U.S.C. §1915(e)(2)(A), the court has discretion whether to dismiss with prejudice.

The court found that the defendant had not shown bad faith because the plaintiff had offered plausible explanations for the discrepancies between her claims and her work calendars, and the defendant admitted that she was owed a substantial amount of overtime that it had stubbornly refused to pay.  The Eleventh Circuit sustained that discretionary decision. *Id*. at  842.[8]

Quite apart from the fact that that discretion denotes the absence of a hard and fast rule, *Langnes v. Green,* 282 U.S. 531, 541; *Rogers v. Loether,* 467 F.2d 1110, 1111–12 (7th Cir.1972) (Stevens, J.), and that on virtually identical facts, two decision makers can arrive at opposite conclusions, both of which constitute appropriate exercises of discretion, *United States. v. Banks*, 546 F.3d 507, 508 (7th Cir.2008), what occurred in *Olivas* is not remotely comparable to what occurred here.  Here, the deviations from the truth from the multiple plaintiffs were so pervasive, so glaring, and so  interrelated and intentionally  corroborative of each other  that it cannot be concluded the plaintiffs were acting  in good faith.  Indeed, the evidence compels the opposite conclusion.

The plaintiffs' reliance on *Barnes v. Dalton*, 158 F.3d 1212 (11th Cir. 1998) is mystifying.

---

[8] Here is how the Court of Appeals put it:

the record does not compel the conclusion that she made the statements for a frivolous or harassing purpose. Indeed, Little Havana admitted that it owed Olivas overtime wages, and the evidence shows that Olivas worked many hours without overtime pay during most of her employment. The record also shows that Olivas consistently asked for overtime wages, but, aside from the short time period she admitted to have received such wages, Mr. Rodriguez did not respond to her requests. The district court could conclude that Olivas initiated the action to recover the wages to which she was entitled, not to harass Little Havana, and therefore it did not abuse its discretion in denying the motion to strike.

*Id*. at 843.

In *Barnes*, the sanction of dismissal was not even on the table: Summary judgment had been granted to the defendant, and the only question was whether sanctions against plaintiff's lawyers were appropriate. The district court found that the defendant "incurred the fees and costs for Dr. Baker's declaration only because Plaintiffs, through [their lawyer,] Mr. Frederick, filed frivolous allegations of adverse impact and a pattern and practice of discrimination which were time-barred and/or had no basis in fact." *Id.* at 1214. The Eleventh Circuit sustained this conclusion, noting that "the pursuit of a claim without reasonable inquiry into the underlying facts can be the basis for a finding of bad faith." *Id.* at 1214. Here, it was not simply the pursuit of a baseless claim without an appropriate inquiry into the facts, , it was the initiation and pursuit of claims that the plaintiffs, themselves, knew were false and which they sought to further through knowingly false sworn statements.

In sum, the evidence clearly and convincingly shows that the plaintiffs intentionally lied about their donning, doffing, and walking times. Those lies were pervasive, mutually corroborating, and constituted the core of their cases. They did the same with the time they supposedly spent at work each day following the scheduled ends of their shifts. These falsehoods constitute perjury and cannot be written off as innocent or *de minimus* overestimates or lies about matters on the periphery of the case. And finally, each plaintiff resisted admitting the truth when confronted with it at the depositions. Those attempted concealments are further evidence of the plaintiffs' bad faith. No plaintiff has offered a plausible explanation for the differences between the declarations and the depositions.

In certain cases, the Seventh Circuit requires the district court to fire a "warning shot" before dismissing a case with prejudice. *See, e.g., McInnis v. Duncan*, 697 F.3d 661, 665 (7th Cir.2012); *Beyer v. Cormier*, 235 F.3d 1039, 1041 (7th Cir. 2000). But that is not an inflexible rule, and in the

case of perjury, no warning is necessary. The plaintiffs, "like any litigant, required no notification that [they]. . . must tell the truth when testifying in an affidavit." *Jackson*, 468 Fed.Appx. at 620. *See also Negrete*, 547 F.3d at 724 ("And although Negrete may not be well educated, it does not take a graduate degree to understand that it is unacceptable to hide evidence and lie in a deposition.").

## CONCLUSION

"No fraud is more odious than an attempt to subvert the administration of justice." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 251(1944)(opinion of Roberts, J.). That is effectively what the plaintiffs attempted to do in this case. Having "trampled on the integrity of the court," *Dotson*, 321 F.3d at 667, they "should not be permitted to continue to press [their] case." *Allen*, 317 F.3d at 703. The defendants' Motion to Dismiss as a Sanction for Plaintiffs' Perjury [Dkt. #77] is granted. This suit is dismissed with prejudice. Consequently, the plaintiffs' Partial Motion for Summary Judgment [Dkt. #81] is moot.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

DATE: 3/19/13